AMP INCORPORATED, Plaintiff,

v.

MOLEX PRODUCTS COMPANY,
Defendant.

No. 68 C 1688.

United States District Court,
N. D. Illinois, E. D.

April 7, 1971.

Anderson, Luedka, Fitch, Even & Tabin, Chicago, Ill., Wm. J. Keating, Harrisburg, Pa., for plaintiff.

Olson, Trexler, Wolters & Bushnell, Chicago, Ill., for defendant.

WILL, District Judge.

FINDINGS of FACT, CONCLUSIONS
of LAW and OPINION

The Court having considered the Agreed Findings of Fact of the parties,

the evidence and the briefs and arguments of counsel, makes the following Findings of Fact and Conclusions of Law.

## FINDINGS of FACT

1. Plaintiff is a New Jersey corporation having its principal office in Harrisburg, Pennsylvania.

2. Defendant is an Illinois corporation with its principal office in Downers Grove, Illinois.

3. Plaintiff and defendant are competitors in the manufacture and sale of electrical connectors.

4. U. S. patent No. 3,075,167 in suit was issued January 22, 1963 to plaintiff as assignee of Robert J. Kinkaid, and plaintiff is the owner of said patent and has been such owner continuously since such date of issue.

5. The Kinkaid patent in suit covers an electrical connector for making disengageable electrical connections with the conductors on printed circuit boards.

6. Within the past 10 to 15 years, printed circuit boards have gone into extremely widespread use in the electronic and electrical industries as a replacement for hand wired and soldered electrical circuits. Such printed circuit boards consist of rigid panels of insulating material having on one or both faces electrical conductors in the form of narrow paths of conductive metal plated onto the boards in predetermined patterns controlled by photo-transfer techniques. The boards are usually provided with holes which pass through the conductors to receive lead wires from electrical components such as resistors, capacitors and inductors which are supported on the board, with the lead wires being mechanically secured and electrically connected to the conductors, for example by dip soldering.

7. Means must also be provided for making electrical connections between the electrical circuit on the board and external electrical circuits. One class of such electrical connectors, which includes the patented invention, frictionally engage a marginal edge portion of the printed circuit board, and have a number of separate, spaced terminals which respectively contact an equal number of spaced, parallel conductors on the edge portion of the board.

8. The connector disclosed in the patent in suit includes a supporting block of insulating material having along one side a trough for receiving the edge of the printed circuit board. The individual terminals are "flag type" terminals which are crimped to external circuit wires with contact arm means extending laterally of the direction of the wire. These terminals are supported within the insulating block side by side in separate, spaced slots which are open not only on the side of the block which contains the trough, but also on the adjacent side, so that the terminals may be inserted into the slots from the adjacent side to a point where the contact arm means is positioned on the side of the trough for resilient engagement with one of the conductors on the printed circuit board when it is inserted into the trough. Since the wires extend perpendicularly to the plane of the printed circuit board, this connector is of the type known as a "right angle" connector. Each of the slots has an enlarged root portion which accommodates the crimped wire barrel of the terminal. The main web of the terminal is generally flat and parallel to the direction of the wire, but is provided on the side opposite the contact arm means with an angularly extending flange which engages a lateral extension of the slot to align the terminal properly in the block. A resilient locking tang projects from the web to engage a shoulder in the slot facing in the direction opposite the adjacent side and lock the terminal in the block. The terminal may be removed from the block by inserting a thin-bladed tool into the slot from the opposite side to depress the tang. Thus the terminals, after being crimped on the external wires, may be inserted into and removed from the block to permit changes in the wiring connec-

tions or checking or servicing of the equipment.

9. About 1963, plaintiff began to make and sell in quantities electrical connectors embodying the patented invention under the trademark "DUO-TYNE," and has continued to sell such connectors to date.

10. About 1968, defendant began to make and sell in quantity the accused electrical connectors under the trademark "EDGECON" and has continued to sell such connectors to date.

11. Defendant designed its accused "EDGECON" connectors after obtaining and examining at least one sample and a set of detailed engineering drawings of plaintiff's patented "DUO-TYNE" connectors, with the express purpose of making the connectors interchangeable, in the sense that they would be applied in the same manner to the same types and sizes of printed circuit boards and would provide all of the other features described in the foregoing paragraph 8. The drawings were supplied to defendant by one of plaintiff's customers, and were marked to indicate that they were drawings of the customer, with plaintiff being named on the drawings as the suggested source of the connectors shown. The dimensions of the supporting blocks of defendant's connectors are identical to those of plaintiff's connectors in a number of respects.

12. The removable terminals in defendant's accused "EDGECON" connectors are similar to those in plaintiff's "DUO-TYNE" connectors, except that in plaintiff's terminals both the upper and lower contact arms are flat and coplanar with the web of the terminal, and the upper and lower faces of the printed circuit board are engaged by the perpendicular inner edges of the contact arms; in defendant's terminals, the upper contact arm is bent so that it has roughly an L shape in cross section, with the perpendicular lower leg of the L engaging the printed circuit conductor over a wider bearing area. Defendant made this change with the intended purpose of avoiding possible damage to the printed circuit conductors on repeated installation and removal of the connector.

13. The Kinkaid patent in suit originally included a total of 10 claims. Claims 1 and 2 have been disclaimed. Claim 9 has been withdrawn with prejudice, but without conceding noninfringement. All of the remaining Claims 3 through 8 and 10 are charged to be infringed by defendant's "EDGECON" connector.

14. All of the claims in suit are directed to right-angle edge connectors for printed circuit boards comprising various combinations of mechanical elements. Claim 8 is illustrative. It is directed to "a disengageable connector for connecting a plurality of lead wires to a panel-like member having conductors thereon" comprising the following elements in combination:

(1) "a dielectric block having a trough extending along one side for reception of an edge of said panel-like member,"

(2) "a plurality of slots in said block extending transversely of, and intersecting said trough, said slots extending inwardly from the edge formed by the intersection of said one side and an adjacent side,"

(3) "enlarged root portions extending inwardly from said adjacent side," and

(4) "a shoulder in said enlarged root portions facing in the direction opposite to said adjacent side," whereby upon insertion of

(5) "a flag-type terminal" having

(6) "laterally projecting arm means" and

(7) "a resilient locking tang"

"into one of said slots from said adjacent side, said tang lodges behind said shoulder to hold said connector in said slot with said arms extending towards said one side and at least partially into said slot, said arms being thereby engageable with said panel-like member to establish electrical contact therewith."

15. Claim 3 is the broadest remaining claim of the patent, omitting several elements from the combination called for in Claim 8, specifically the enlarged root portions, the shoulders in the root portions and the tangs engageable with the shoulders. However, in Claim 3 the terminals and their attached wires are a positively recited element, rather than being referred to only in the "whereby" clause as in Claim 8.

16. Claim 4 is dependent upon Claim 3 and adds to the combination of that claim the enlarged root portions in the slots, making clear that these portions receive the wire barrel portion of the terminal, thereby allowing full insulation of the terminals.

17. Claim 5 is also dependent upon Claim 3, but adds the shoulders in the slots and the tangs on the terminals abutting the shoulders to retain the terminals in the slots. Claim 5 thus recites the complete combination of Claim 8, except for the enlarged root portions.

18. Claim 6 is the narrowest claim of the patent. It includes all of the elements of Claim 8 but describes the "arm means" more specifically as "a pair of contact arms" and specifies in the terminal "whereby" clause that, upon insertion of the panel-like member, "said arms are spread apart and are maintained in engagement with conductors on the surface of said panel."

This claim thus effectively requires a connector having terminals with a pair of spaced arms which are capable of electrical engagement with conductors on both sides of the printed circuit board.

19. Claim 7 is of roughly the same breadth as Claim 8, being broader in the one respect that it omits the enlarged root portions in the slots, while including all of the other elements of the combination, and narrower in another respect, in that it requires "spaced apart * * contact arms."

Unlike Claim 6, Claim 7 does not state in the "whereby" clause that the contact arms are "maintained in engagement with conductors on the surface of said panel." Instead, Claim 7 merely specifies that the arms "establish electrical connection with said panel-like member upon insertion thereof into said trough."

20. Claim 10 is similar to Claim 7 but narrower in that it describes the slots in more specific terms: it specifies that the slots are "relatively narrow" and that the slots have "a depth, as measured from said one side, which is at least as great as the depth of said trough."

21. The infringement of Claims 3, 4, 5, 8 and 10 is conceded, provided these claims are valid. With respect to the other two claims, 6 and 7, defendant has conceded that they are also fully readable on the accused "EDGECON" connectors, except for the portion of Claim 6 which calls for "a pair of contact arms" and the portion of Claim 7 which calls for "contact arms." Thus, insofar as the issue of infringement is concerned, the only dispute concerns whether the lower one of the two arms of the terminal of the accused "EDGECON" connector is a "contact arm."

22. In attacking the validity of the Kinkaid patent in suit, defendant relies on a total of 6 prior patents and publications, of which 5 (the Buggie catalog and the Morone, Hammel, Burtt and Kirk patents) were cited and considered by the U. S. Patent Office before it granted the Kinkaid patent in suit. The only new reference relied on by defendant in attacking the Kinkaid patent is the J. J. Ayres U. S. patent No. 2,730,683.

23. The most pertinent single reference is the Buggie catalog, which was extensively discussed during the prosecution of the application for the Kinkaid patent in suit. It shows a right-angle edge connector for printed circuit boards, in which each of the terminals has two arms which are spread apart on insertion of the printed circuit board and which contact conductors on either or both sides of the board. However, the housing is not provided with slots which permit insertion and removal of the terminals, as is the patented connector. Instead, Buggie's housing is made in two

parts which are riveted together at the factory after the terminals have been mounted therein, and which are not intended to be disassembled. The terminals are supported in L-shaped tunnels formed by the assembled parts, so that the terminals cannot readily be removed from the housing for service or testing or for wiring changes, as in the patented connector.

The Buggie connectors were sold for a time, but were taken off the market about 1964, shortly after the AMP "DUO-TYNE" connectors became commercially available.

24. Defendant also relies heavily on the newly cited Ayres patent No. 2,730,-683. Ayres discloses an edge connector for printed circuit boards. In the illustrative embodiment of Ayres, the housing of this connector is provided with opposed troughs simultaneously to receive the edges of a pair of opposed printed circuit boards. Slots extend inwardly from the intersection of the trough side and the adjacent side to intersect the trough and to receive metal terminals. Each of these slots receives one leg and a laterally extending contact arm of a terminal having a second leg received in a hole extending vertically through the housing. Each terminal is inserted in the respective slot perpendicular to the plan of the printed circuit board. The contact arm is spaced from the trough during insertion of the printed circuit board, so that the board may be inserted optionally from the face of the housing or lengthwise of the trough. After the board has been fully inserted, an eccentric cam shaft is rotated through a quarter revolution to engage the contact arm and press it into engagement with a conductor on the board.

The opposed terminal in the other half of the housing is also mounted with one of its two legs extending through the same vertical hole. A wire is inserted into the hole between these two legs, locking the terminals in place by preventing inward movement of the kinks at the lower ends of these legs. The wire may be connected to the two opposed terminals by soldering it to the exposed kinks.

The Ayres connector differs in a number of respects from the claimed structure. Ayres is relied on by defendant in large measure to show one of the elements of the claims which is absent from the Buggie connector: slots in the housing extending inwardly from the intersection of the trough side and the adjacent side.

The Ayres patent is assigned to and owned by Radio Corporation of America (hereinafter RCA). Electrical connectors of the type disclosed in this patent have never been commercially manufactured, offered for sale or sold by RCA or by anyone else with the knowledge of RCA.

The combination of Buggie and Ayres would not include several of the elements recited in some of the patent claims, such as the "enlarged root portions" of the slots (claims 4 and 8), which receive a portion of the terminal secured to the wire, the shoulders in the slots (claims 5, 6, 7, 8 and 10), and the resilient tangs which latch behind the shoulders to lock the terminals in place in the slots (claims 5, 6, 7, 8 and 10).

25. Plaintiff's disclaimer of Claims 1 and 2 of the Kinkaid patent in suit was filed after counsel for defendant had served on plaintiff's counsel a notice of the prior art on which defendant would rely in this action, and was at least partially motivated by the disclosure of the additional patents cited by defendant, including Ayres.

26. The Ritter U. S. patent No. 2,-829,359, which was cited and considered by the Patent Office during prosecution of the application for the Kinkaid patent in suit, also shows an edge connector for printed circuit boards in which the housing is provided with a trough to receive the edge of the board, and with slots which extend to the intersection of the trough side and the adjacent side and receive metal terminals. The terminals are inserted into the block parallel to the plane of the printed circuit board.

The terminals have resilient contact portions which frictionally engage the printed circuit conductors as the board is inserted into the trough.

27. The Hammel U. S. patent No. 2,888,662, which was also cited by the Patent Office, shows a somewhat different type of connector. It is relied on by defendant only for its showing of a shoulder in a housing engageable by a resilient tang on a crimped terminal to lock the terminal in place, with its crimped wire barrel within the slot in the housing.

28. The Morone, Burtt and Kirk patents relied on by defendant generally disclose none of the elements of the claimed combinations which are not disclosed by one or more of the other references discussed hereinabove. All of them were cited and considered by the Patent Office during prosecution of the Kinkaid application.

29. Although all of the elements called for in all of the patent claims in issue were individually old, in different combinations used in different environments, no single item of prior art discloses the complete combination defined by any of the patent claims in suit. There is no anticipation of the claimed invention within the contemplation of 35 U.S.C. § 102. The only question with respect to the validity of the claims in issue is whether, in 1960, when the alleged invention was made, the claimed combination would have been obvious to one having ordinary skill in the electrical connector art, as defined by 35 U.S.C. § 103.

30. The patented connector accomplished a new result in that it provided a right-angle printed circuit board connector in which the terminals and their attached wires could be inserted into and removed from the housing. This permitted the complete wiring harness to be pre-assembled in a separate mass production operation, with the attached terminals thereafter being merely inserted into the appropriate slots in the mounted housings for rapid wiring even by unskilled labor. It also permitted changes in circuitry or replacement of damaged terminals, without having to replace the entire connector or having to disturb any other part of the circuit. This was a step forward in the art.

31. Defendant filed an application for patent on its accused connectors, which is still pending in the Patent Office.

32. Claims 5, 6, 7, 8 and 10 of the Kinkaid patent in suit recite, in terms of varying scope, all of the elements necessary to make a fully workable right-angle edge connector for printed circuit boards.

*Indicia of patentable invention*

33. The patented connector solved a problem which had existed for some time in the art and for which others had unsuccessfully sought a solution.

34. Even after the patented design was completed, there was considerable delay in introducing it to the market, because plaintiff could not find a molder who believed it possible to mold in one piece a plastic block of such intricate design, with slots opening to three sides, requiring several sets of movable mold cores.

35. The patented connector has enjoyed widespread and steadily growing acceptance in industry, plaintiff's sales of "DUO-TYNE" connectors totalling more than 9,000,000 housings and 85,000,000 terminals.

36. The prior art relied on by defendant here in attacking the validity of the Kinkaid patent in suit is no more relevant than that cited and considered by the Patent Office during prosecution of Kinkaid's application.

37. The Ayres patent No. 2,730,683, the only new reference relied on by defendant here, discloses a connector which is not only entirely different in structure from that of the claimed connector, but which has none of the functional advantages which Kinkaid sought and achieved, such as the insertability and removability of the terminals with the wires attached and the full insulation of the terminals. Ayres adds nothing

of substance to the art cited by the Patent Office. While Ayres discloses an edge connector for printed circuit boards in which the insulator housing in the trough which receives the edge of the board is intersected by transverse slots extending inwardly from the intersection of the trough side of the housing and the adjacent side, so does Ritter patent No. 2,829,359, which was cited by the Patent Office.

In Ritter, as in Ayres, the slots extend into the housing for the full depth of the trough to receive one leg of a hairpin shaped terminal, from the inner end of which leg projects a contact portion adapted for engagement with conductors on the printed circuit board.

In the Ritter connector, the terminal is inserted into the housing from the side which contains the trough, while in the Ayres device, the terminal is inserted from the adjacent side. However, the Ritter device is functionally much more similar to the patented device than is Ayres, because the contact portions of the Ritter terminals project into the trough and frictionally engage the conductors of the printed circuit board as the board is inserted into the trough, while the Ayres terminals do not project into the trough and do not engage the printed circuit conductors until the eccentric cam shaft has been rotated through a quarter revolution.

38. Defendant's design of the accused "EDGECON" connector was largely copied from the patented "DUO-TYNE" connector. The "EDGECON" duplicates many of the dimensions of the "DUO-TYNE" to within one-thousandth of an inch, including at least one dimension, the spacing from the end of the board to the center of the first conductor, which differs from the usual industry standard.

*Infringement*

39. The only significant modification which defendant made from the patented design was to widen the contact portion of the upper arm of the terminal, and bind it to provide a resilient convex contact pad. This was done with the intention of eliminating a problem with plaintiff's "DUO-TYNE" connectors which one of plaintiff's customers, Magnavox, had reported, scratching of the printed circuit conductors by frictional engagement with the contact arm. The difficulty was completely eliminated by several minor changes in the "DUO-TYNE" design.

The widening of the contact portion of the upper arm of the "EDGECON" connector actually results in poorer electrical engagement with the printed circuit conductors, since a narrower contact surface affords better penetration of the non-conductive oxide coating which exists on all metallic surfaces.

40. The upper and lower arms of the terminal of the "EDGECON" connector make physical contact with the upper and lower faces of the printed circuit board, the space between these arms normally being .051″ and the nominal thickness of the boards being .063″, so that the convex contact pad of the upper arm is resiliently depressed a distance of approximately .012″ as the board is inserted. The lower arm supports the board and furnishes the pressure necessary thus to depress the convex contact pad of the upper arm.

41. The patent in suit discloses a connector which is usable with printed circuit boards having conductors on either side only or on both sides, although all of the drawings show only one-sided boards. Approximately 85 per cent of the printed circuit boards currently in commercial use are one-sided. When used with such one-sided boards, there is no difference whatever in the function and use of the "EDGECON" connectors and the patented connectors.

42. When used with double-sided boards, the upper and lower arms of the terminals of the "EDGECON" connector will make electrical contact with conductors on both sides of the board, provided the conductors are aligned with the lower arms. Since the thin contacting edges of the lower arms are slightly offset laterally with respect to the centers of the

wide contact pads of the upper arms, if the printed circuit conductors on the top side of the board are aligned directly above those on the bottom side, and if the board is inserted so that the upper conductors are centered with respect to the contact pads on the upper arms, the lower arms may not engage the lower conductors, depending on the width of the conductors. Since printed circuit boards are virtually always made to order, it is generally possible to position the conductors on the upper and lower sides so that both will make definite electrical contact with the respective arms of the "EDGECON" terminals. If that is done, the lower arm will make better electrical contact than the upper arms.

43. The upper and lower arms of the terminal of the accused "EDGECON" connector are both "contact arms," not only in the sense of mechanical contact but also in the sense of being capable of making electrical contact with conductors on both sides of a properly designed double-sided board.

44. Defendant developed its terminal at the request of Magnavox.

45. Plaintiff did not mark its "DUO–TYNE" connectors with any patent notice.

## CONCLUSIONS OF LAW

1. The patented invention was not obvious to persons having ordinary skill in the art at the time the invention was made. Such non-obviousness is established by the circumstances and events before and after the invention, including the following:

(a) The invention satisfied a recognized need which others in the art had unsuccessfully attempted to fulfill.

(b) Even after the invention was made, there was skepticism about its commercial practicality.

(c) The patented connectors have enjoyed substantial commercial success, displacing from the market the most similar prior art devices.

(d) Defendant substantially copied the patented connectors.

(e) Defendant lavishly praised the patented invention in its advertising and even attempted to obtain a patent on its infringing connectors, which involved only minor structural changes from the patented device.

2. Claims 5, 6, 7, 8 and 10 of the Kinkaid patent in suit are valid.

3. Claims 5, 6, 7, 8 and 10 of the Kinkaid patent in suit have been infringed by defendant through the manufacture and sale of the "EDGECON" connectors.

4. Plaintiff is entitled to an injunction against further infringement and to damages for past infringement, such damages to be determined by an accounting.

## MEMORANDUM OPINION

The parties in this action have stipulated that while all of the elements called for in plaintiff's Kinkaid patent No. 3,-075,167 are individually old and in different combinations have been used in other applications and environments, no single item of prior art discloses the complete combination defined by the claims in suit. It is also agreed that there is no anticipation of the combination within the meaning of 35 U.S.C. § 102. Defendant contends, however, that the claimed combination would have been obvious to one having ordinary skill in the electrical connector art as defined in 35 U.S.C. § 103.

The parties have also stipulated that plaintiff's "DUO–TYNE" connector, the patented device, accomplishes a new result in that it provides a right angle printed circuit board connector in which terminals and their attached wires can be readily inserted into and removed from the housing. This permits the complete wiring harness to be pre-assembled in a separate mass production operation, with the terminals thereafter being inserted into the appropriate slots in the circuit board for rapid wiring even by unskilled labor. It also permits changes in circuitry or replacement of damaged terminals without replacement of the en-

**1372**

tire connector or risk of damage to other parts of the circuit. It is agreed that this is a step forward in the art.

With the increasing and widespread use of printed circuits in the electronic and electrical industries and the vigorous price competition in many products utilizing printed circuits, the patented connector has been a commercial success although its entry on the market was delayed because plaintiff had difficulty finding a molder who could produce a one-piece plastic block of such intricate design with slots opening to three sides which requires several sets of movable cores in the molding process.

The record is also clear that the new connector commercially replaced a prior art device, the so-called "Buggie" connector, and that defendant copied plaintiff's "DUO–TYNE" connector in developing its accused "EDGECON" connector.

With respect to the six items of prior art on which defendant relies, five were cited and considered by the Patent Office. The sixth, the Ayres patent, while it disclosed some of the elements here involved, was a substantially different device which, although owned by RCA, was apparently never used or sold commercially. Moreover, as previously indicated, the parties agree that, while the individual elements combined in the Kinkaid patent are old, the combination is new.

Applying the criteria enunciated by the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, it is clear that certain of the claims of the Kinkaid patent are valid. The prior art did not result in a connector into which terminals with wires attached could be easily inserted and removed from the connector housing. Earlier connectors required that the wires be soldered onto the circuit board or terminals projecting therefrom. This required relatively skilled labor and, once

soldered to the board, the wire could be removed only by force or melting the solder. Moreover, the terminals were necessarily at least partly exposed creating the possibility of short circuits or electrical shock. In the patented device, the terminals are completely inserted into the plastic housing which is, of course, an insulator, thus eliminating that possibility.

The Ayres patent, which defendant urges as the most relevant prior art, is owned by RCA,[1] an obviously large user of printed circuits and connectors therefor. Yet RCA came to the plaintiff to inquire if an insertable-removable connector could be developed. Notwithstanding the engineering talent available to RCA and other electrical and electronic manufacturers, Kinkaid's device was not obvious to them. Engineers of exceptional, much less ordinary skill in the art, did not perceive his solution. The Buggie, Ayres, Ritter, Morone, Hammel, Burtt and Kirk patents are all substantially different from the Kinkaid device. Ayres, which defendant claims is most relevant does not utilize "enlarged root portions extending inwardly" from the adjacent side. In Ayres, what might be assimilated to the Kinkaid "root portions" are not in the slots but on the opposite side of the block and do not extend inwardly from the side in which the contacts are inserted. Nor do they serve to receive the wire barrel of the flag-type terminal connector in the slot.

Ayres likewise lacks a shoulder in the slot or a resilient locking tang abutting the shoulder to hold the connector in the slot. Ayres' mechanism to accomplish this end is totally different. There are additional differences, but only by working backwards from Kinkaid's device can one find any similarity in Ayres. The prior art did not anticipate Kinkaid's combination.

The secondary considerations referred to by the Court in Graham v. John Deere

---

1. Defendant, in its brief, asserts that the Ayres patent is owned by RCA-Whirlpool. The parties in their "Agreed Findings of Fact" stipulated that it was owned by RCA.

Co., commercial success, long felt but unsolved needs, etc., likewise disclose that Kinkaid's device represents invention. Defendant, by copying plaintiff's device, gives eloquent testimony of the fact that the prior art did not make obvious Kinkaid's insertable-removable connector. Not only did the defendant copy plaintiff's connector but it advertised its copy as "a giant step forward in cost reduction of printed circuitry" and filed its own application for a patent on its device.

There remain the questions of which of the claims in suit are valid and whether or not defendant's device infringes the valid claims. The patent contains ten claims. Initially in this action, plaintiff withdrew Claim 9 and during the discovery period disclaimed Claims 1 and 2. In its post-trial brief plaintiff concedes that Claims 3 and 4, which omit the means for retaining the terminals in the slots, the shoulder and resilient locking tang, do not contain a sufficient description of the invention. It urges, however, that the remaining five Claims, 5, 6, 7, 8 and 10, are valid. Defendant attacks the validity of all five claims on the general ground of obviousness in light of the prior art and each claim on additional specific grounds. We have already discussed and disposed of the general defense. As to the specific grounds, they are insubstantial. As to Claim 8, for example, in addition to urging that its elements are to be found in the earlier patents, particularly Ayres, defendant asserts that the claim "is so replete with errors and ambiguities as to be invalid." The first asserted ambiguity is the reference to "said connector" in line 16 of the claim (column 6, line 43 of the patent). Defendant contends that "there is no antecedent basis whatsoever" for it in the claim. It is, however, clear from even a casual reading of the claim that "said connector" refers to and is synonymous with the "flag-type terminal having laterally projecting arm means" described earlier. That terminal is a connector, since it makes the connection be-

tween the wire and the contact point on the circuit board.

The other alleged ambiguity is that in lines 10 and 11 of Claim 8 (column 6, lines 38 and 39 of the patent) there is a reference to enlarged root portions in the plural but line 11 refers only to a single "shoulder" in the plural "portions." The patent contemplates a connecting device with a variable number of slots each of which will have a root portion and each root portion will in turn contain a shoulder. The plural reference in the patent to "root portions" obviously refers to all of the slots in a unit and the singular reference to "shoulder" designates the shoulder in each of the root portions. Only a reader determined to be confused would find ambiguity here.

We conclude then that Claims 5, 6, 7, 8 and 10 all include the essential elements of the invention. In typical patent language, they describe the various elements in different verbiage and some are slightly narrower or broader than others but they all describe the combination of elements making up the patented device. Claims 5, 7 and 10 omit the element of enlarged root portions in the slots, but this is not an essential element of the connector. Accordingly, we hold that Claims 5, 6, 7, 8 and 10 are valid.

As to infringement, the parties have previously stipulated that defendant's device infringes Claims 5, 8 and 10, but defendant denies that it infringes Claims 6 and 7 which call for a "pair of contact arms" (Claim 6) or "spaced contact arms" (Claim 7). Defendant contends that while the upper arm on its terminal is a "contact arm" the lower one is not but is intended only to hold the arm tightly to the board. Plaintiff insists that the bottom arm is capable of making contact if the printed circuit conductors on the bottom side of the board are aligned so as to make contact with the pressure arm.

It is true that the lower arm is capable of making contact under special circumstances. It is equally true that this is

not its prime function and that it was not designed or constructed to serve as a contact arm. The difference in structure between plaintiff and defendant's lower arms is substantial, the former intended for use both as a pressure and contact arm while the latter is obviously intended primarily to serve as a pressure arm but can, in fact, serve as a contact arm. In light of the foregoing, we conclude that defendant's device does have a pair of contact arms and infringes Claims 6 and 7 even though defendant's lower arm is only incidentally a contact arm.

The final issue for determination is plaintiff's demand for treble damages and attorneys' fees on the ground that defendant deliberately copied plaintiff's patented device to make its connector interchangeable with that of plaintiff, obtained drawings of plaintiff's connector from one of plaintiff's customers and duplicated many of the dimensions of plaintiff's device as far as possible. In addition, plaintiff urges that defendant has made no effort to change its product to avoid infringement since this action was filed even though it admits that its device infringes Claims 3, 4, 5, 8 and 10 of the patent.

Defendant responds by pointing out that plaintiff did not identify its device as patented, that the drawings it obtained from Magnavox contained no indication of any patent and were given to defendant after Magnavox requested its assistance in developing a connector. Since the application was to be the same, defendant points out, many of the dimensions were bound to be the same.

■ Of the ten claims of the original patent, only five have been found valid and infringed by defendant's device. Moreover, there is no reason to believe that defendant's challenge to the validity of all the claims was not made in good faith although erroneous as to some. Accordingly, neither attorneys' fees nor treble damages may properly be awarded against defendant.

Plaintiff is, however, entitled to an injunction against future infringement and damages for past infringement, such damages to be determined by an accounting, together with reasonable costs as determined under the applicable rules. A judgment consistent with the foregoing will be entered.