**RITE–HITE CORPORATION, Acme Dock Specialists, Inc., Allied Equipment Corp., Anderson Material Handling Co., Applied Handling, Inc., C & L Equipment Corporation, W.E. Carlson Corporation, R.B. Curlin, Inc., Equipment Systems, Inc., Great Northern Industrial Prod., Inc., HOJ Engineering & Sales Co., Inc., Indy Equipment Company, Inc., Johnson Equipment Co., Keller Equipment Co., Inc., King Industrial Equipment, Inc., Loading Dock Equipment Co., Inc., McCormick Equipment Company, Inc., Metro Dock Specialists, Inc., Mid-Atlantic Handling Systems, Inc., Niehaus Industrial Sales, Inc., Northway Material Handling Co., Inc., Rice Equipment Co., Stokes Equipment Company, Inc., Timbers & Associates, Inc., Todd Equipment Corporation, U.S. Materials Handling Corp., John L & Associates, Inc., and Stordox Equipment Co., Plaintiffs,**

v.

**KELLEY COMPANY, INC., Defendant.**

Civ. A. No. 83–C–434.

United States District Court, E.D. Wisconsin.

March 5, 1986.

See also, 99 F.R.D. 332.

Theodore W. Anderson, Arthur W. Olson, Jr., Lawrence E. Apolzon & Roger H.
Stein, Neuman, Williams, Anderson & Olson, Chicago, Ill. and Gilbert W. Church, Foley & Lardner, Milwaukee, Wis., for plaintiffs.

Glenn O. Starke, Andrus, Sceales, Starke & Sawall, and Matthew J. Flynn, Quarles & Brady, Milwaukee, Wis., for defendant.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

This is an action in patent infringement and unfair competition. Federal jurisdiction derives from 28 U.S.C. § 1338. The plaintiffs Rite-Hite Corporation ("Rite-Hite") and its independent representatives seek a judgment that a truck restraining device manufactured and distributed by defendant Kelley Company, Inc. ("Kelley") infringes a patent owned by Rite-Hite, and that Kelley has competed unfairly by its use of a promotional film. Kelley has counterclaimed, alleging that Rite-Hite's patent is obvious in view of the prior art and is therefore void, and that Rite-Hite has competed unfairly.

The parties have agreed that the issues of liability and damages be tried separately. Rite-Hite also applied for preliminary injunctive relief with respect to its claim of unfair competition respecting Kelley's promotional film, and Kelley was enjoined from further use of unexpurgated versions of the film by the Court's order of March 16, 1984. Kelley was subject to this order at the time the issues of liability on the patent claims and Kelley's claims of unfair competition were tried to the Court.

The foregoing claims were tried to the Court between May 20 and May 29, 1985. At the close of the proceedings, I stated:

I am persuaded that the evidence compels a decision that the patent is valid. It was not obvious. And I am sorry that I have to find that the patent was infringed.

I do not believe the infringement was willful. I think that the Kelley people, in the spirit of good competition, Rite-Hite came out with a product, and they wanted to meet the product and they did the

best they could and certainly did not intend to infringe on that patent, but I think the evidence compels me to find that they did.

As far as the unfair competition issues involved, the use of the injunctive powers of the federal court I think should be used very sparingly. I don't think there is any irreparable injury on either side as far as this advertising. The film has not been used for a couple years, or at least since we had the hearing on preliminary injunction. I see no reason for the Court in the exercise of its discretion and injunctive powers to be issuing—equity powers, issuing any more injunctions for either side.

The plaintiffs were then directed to file proposed findings of fact and conclusions of law, with a period of time allotted to defendant to comment thereon. The plaintiffs have filed their submission, the defendant has objected to certain provisions, and the plaintiffs have responded to the objections. Kelley has also moved for a stay of the injunction pending appeal, and Rite-Hite opposed this motion. I am persuaded that certain of the objections should be sustained, but that others would direct an outcome favoring the defendant and are not supported by the evidence. What follows, therefore, are essentially the findings of fact and conclusions of law proposed by plaintiffs with exceptions where a defense objection has been sustained by the Court in view of the evidence presented at trial.

## I. FINDINGS OF FACT

### A. *Parties and Jurisdiction*

1. Plaintiff Rite-Hite is a Wisconsin corporation having its principal place of business at Milwaukee, Wisconsin. The other plaintiffs are Rite-Hite's independent and exclusive sales representatives throughout the country.

2. Defendant Kelley is also a Wisconsin corporation with its principal place of business at Milwaukee, Wisconsin.

3. Rite-Hite and Kelley, together, are dominant factors in the dock leveler industry and have been keen competitors since Rite-Hite was founded in 1965.

4. This is an action for patent infringement arising under the patent laws of the United States, Title 35 U.S.C. The court has jurisdiction under 28 U.S.C. § 1338(a), and venue lies in this district under 28 U.S.C. § 1400(b).

5. There are also claims and counterclaims for unfair competition arising under the statutory and common laws of the State of Wisconsin. The court has jurisdiction under 28 U.S.C. § 1338(b).

### B. *History of the Case*

6. This action was initiated in early 1983, shortly after the patent-in-suit issued. Rite-Hite charged Kelley with infringement of U.S. Patent 4,373,847 (the '847 patent), as well as with unfair competition. On a preliminary injunction motion, the unfair competition count was heard by this Court on February 27 and 28, 1984. A decision was rendered in favor of Rite-Hite on March 16, 1984, granting a preliminary injunction enjoining use of a motion picture film which appeared to characterize unfairly Rite-Hite's Dok-Lok product.

7. Rite-Hite subsequently filed a motion for intervention on behalf of certain independent and exclusive Rite-Hite sales representatives, and the motion was granted. A trial was held before the Court in this action from May 20 through May 29, 1985. The main issues were (1) whether or not the defendant Kelley has infringed the '847 patent owned by the plaintiff Rite-Hite, and under which the other plaintiffs—Acme Dock Specialists, Inc., et al.—have certain exclusive territorial rights, and (2) whether Kelley could carry its burden that the '847 patent is invalid. The remaining issues relate to unfair competition and are mentioned further below.

### C. *Rite-Hite's Background*

8. Dock levelers, or automatic dockboards, are devices that automatically or semi-automatically bridge the gap between a truck and a dock so that forklift trucks

can safely pass over that gap during the loading and unloading process. Dock levelers, in general, have replaced the loose plates that were often used when loading and unloading was done manually.

9. For years, dock leveler users and manufacturers as well as regulatory agencies recognized that a safety hazard existed because of the way that large trucks and trailers, for a variety of reasons, inadvertently separated from the dock during the loading or unloading process. If this happens a forklift can fall through the gap between the truck and dock onto the driveway below, and the results for the forklift truck and its operator can be catastrophic.

10. For instance, the forklift truck will almost always drop to the pavement if, when the truck pulls away, the forklift is parked in a position where it is supported in part by the dockboard and in part by the truck. In this situation, there is nothing at all to keep the forklift and its operator from falling through the gap between the truck and the dock.

11. The forklift truck will also be exposed to this type of accident if it is moving either into or out of the truck or trailer at the time the truck separates from the dock. In such situations, the driver may not notice the gap and drive the forklift off the truck bed, especially if he is backing up out of the truck. Another hazard exists from sudden accelerations and decelerations of a loaded forklift inside a truck. In this situation, a considerable force tending to push the truck away from the dock can produce disaster. This phenomenon is sometimes referred to by Kelley and Rite-Hite as "trailer creep."

12. Aware of these life-threatening problems, but lacking a real solution in the late 1960's and early 1970's, Rite-Hite provided its only answer at that time, its Total Dock Safety (T.D.S.) Package (PTX-3)[1], which included wheel chocks, a large warning sign, and a "Dock Safety Rules" sign. But these were not an adequate remedy for the problem. Kelley worked on a somewhat similar and equally ineffective "communication" system.

13. In yet another situation, the forklift driver can suffer severe or fatal injuries even if, when the truck inadvertently separates from the dock, the forklift is parked in a stationary position on the dockboard and is fully supported by the dockboard. This is because, in normal operation, the outward or free end of the dockboard rests on the bed of the truck. When the vehicle pulls away, the end of the dockboard lip that was supported by the truck tends to drop. This, in turn, tends to tip the whole dockboard downwards and pitch the forklift, its operator, and/or its load onto the driveway.

14. To eliminate this latter hazard, dock leveler manufacturers many years ago designed safety devices into their dock levelers to limit the extent to which the dockboard could tip downwards in the event of the inadvertent separation of the truck from the dock. Kelley developed its "Panic Stop," which was patented in the middle 1960's (DTX-183-8). This device had a ratchet that was engaged to prevent the outward end of the dockboard from moving downward if the dockboard started to move down abnormally fast. This prevented the further downward progress of the board. Rite-Hite also developed its patented "Safety Legs" in the early 1970's which, when not needed, could be pulled away, but when in normal operation, limited the extent to which the dockboard would descend in this situation. Neither of these devices provided a complete solution to the problem, but they clearly recognized the very real hazard and need. In its 1966 patent (DTX-183-8), Kelley acknowledged that dock accidents could result in death and added that the problem of accidental dropping of the ramp "has been a thorn in the side of mechanical dockboards for as long as such boards have been made" (DTX-183-8, col. 2, lines 40-43).

1. References to plaintiffs' trial exhibits will be identified as "PTX _____" and defendant's trial exhibits as "DTX _____."

15. The question of whether the dockboard safety devices described above could be sold as "options" or whether they should always be made mandatory features on all dock levelers was the subject of disputes between dock equipment manufacturers. Rite-Hite sold its devices as standard equipment. Kelley's devices were sold as options.

16. A meeting of American National Standards Institute (ANSI) Safety Committee MH14 was held in October 1975 to consider, among other things, this question of whether "safety legs" on dock levelers should be options or standard. During the course of this meeting, Rite-Hite's founder and representative at the meeting, Arthur K. White, became convinced that these safety stop devices then being offered were an approach to only part of the problem. He concluded that what was really needed was something to restrain the vehicle physically so that it could never move away from the dock inadvertently. No effective device was offered on the market at that time. Wheel chocks were ineffective. Warning and "communication" systems were likewise ineffective.

D. *The Development of Vehicle Restraints at Rite-Hite*

17. The '847 patent claims one of a series of basic inventions that Rite-Hite made during a product development program that lasted for a number of years. After Rite-Hite introduced its commercial Dok-Lok vehicle restraints, the rest of the industry, including Kelley, were skeptics or copyists.

18. Rite-Hite's development program was long and arduous. Rite-Hite's first vehicle restraint, which was developed by 1977 but never marketed, involved a mechanism mounted on a driveway in front of a loading dock. The "engaging mechanism" was disposed at an angle relative to the driveway and engaged a part of the truck. Another device developed shortly thereafter consisted of a pipe clamp type of latch which held a flexible steel cable and industrial hook that could be attached to any holes or crevices in the trailer to hold it in place (PTX–16). The next effort involved a flexible cable and hydraulic holding device (PTX–124). Both of these devices were mounted on the dock platform. These devices all performed the same function that they were designed to perform, i.e., they prevented the truck from inadvertently separating from the dock. Rite-Hite filed a patent application in October of 1977 for the Hydraulic Securing Device (flexible cable) that ultimately issued as U.S. Patent 4,146,888 on March 27, 1979 (PTX–1b). A physical example of this device was demonstrated at the trial (PTX–16).

19. But these early vehicle restraints had drawbacks. They were relatively expensive, and they were relatively difficult to use. They were also obtrusive and vulnerable to damage because of their location either on the driveway, where they could be hit by trucks or snowplows, or on the top surface of the loading dock, where they could obstruct traffic or be vulnerable to forklift trucks moving about the dock.

20. By the spring of 1978, Rite-Hite had developed a vehicle restraint mounted on the vertical face of the dock where it was less of an obstruction and less likely to be damaged. This device included a "pivoted hook" member. The hook had a shank pivoted to the wall and a right angle hook to engage a vehicle. The hook member, when not used, was stored in a downwardly rotated position with the shank pendent along the wall. As the pivoted hook members refined over several generations, the hook was operable either manually (by a driver standing on the driveway) or automatically (with the power of an activated dock leveler). When used, it was pivoted upwardly to an operative mode to engage the truck via the truck's ICC bar. This device represented a major advance in the art of vehicle restraints. Accordingly, Rite-Hite filed a patent application which issued as U.S. Patent 4,208,161 (PTX–1d). Physical exhibits of these devices were also demonstrated at the trial (PTX–17 and PTX–18).

21. But these devices with a pivoted hook also had drawbacks. The main drawback was the fact that they were limited in terms of the variations in ICC bars that could be accommodated. ICC bars are bars that the Interstate Commerce Commission requires on most trucks to prevent low automobiles from running underneath them in the event of rear-end collisions. To learn about the variations in ICC bars, Rite-Hite conducted surveys of thousands of trailers and obtained data from trailer manufacturers. These surveys indicated that ICC bars were present on all over-the-road trailers and also provided Rite-Hite with extensive knowledge about the differences that existed between the various ICC bars in terms of shape and height from the ground. Rite-Hite found that the ICC bar height varied as much as 15 inches from the legal maximum of 30 inches above the ground, and this variation presented serious problems for Rite-Hite's early pre-1978 inventive efforts. The surveys also showed that "over-the-road" trailers had a suspension "float" of 2 inches to 2½ inches. Float was accommodated in one of the earlier generations (PTX-18) by permitting the hook to rotate against the resistance of a spring.

22. By late 1978, an adjustable trapezoidal carriage was developed and added, and the pivoted hook was then mounted in the carriage. The carriage was biased upward with springs stored in the dock leveler to hold the carriage with the enclosed hook above the ground when it was not in operation. The carriage was actuated by movement of the ICC bar so that the carriage moved down against the springs as the truck backed into the dock. The downward movement of the carriage positioned the hook so that it was always in a good position to be activated and pivoted up to engage the ICC bar. With this device, Rite-Hite found it could accommodate the vast bulk of the ICC bars which its research had indicated would be encountered. The carriage also accommodated "float." This device was another substantial advancement in the art of restraining trucks, and Rite-Hite filed a patent application resulting in U.S. Patent 4,282,621 (the '621 patent) (PTX-6h). A physical exhibit of this device was demonstrated at trial (PTX-19).

23. In 1979, Rite-Hite developed some improvements which further refined this "pivoted hook" restraint. Among other things, the springs are incorporated into opposite sides of the trapezoidal carriage along which the carriage slides so that the restraint can operate independently of any dock leveler, and rotation of the hook was motorized. It is this version of a restraint with a pivoted hook that was ultimately commercialized in the spring of 1980 as the Model ADL-100 Dok-Lok vehicle restraint. U.S. Patent 4,264,259 (the '259 Patent) (PTX-6j), disclosing and claiming this device, issued on April 28, 1981. This device was also demonstrated at trial (PTX-131).

### E. *U.S. Patent 4,373,847*

24. Rite-Hite's development program continued after the introduction of the Model ADL-100. One of the program's objectives was cost reduction and simplification. In order to achieve that objective, a vehicle restraint that was simple, more rugged and inexpensive, and that could be manually operated, if desired, was sought.

25. In the spring of 1981, about a year after the introduction of the ADL-100, Steven Hipp and Norbert Hahn developed the first of Rite-Hite's MDL vehicle restraints. This is the system of the '847 patent and the Kelley Truk Stop. The '847 patent is entitled RELEASABLE LOCKING DEVICE, was filed in the U.S. Patent and Trademark Office on May 4, 1981, and issued on February 15, 1983.

26. The '847 patent is directed to a new approach to a vehicle locking device or vehicle restraint for securing a parked vehicle to an adjacent stationary upright structure such as a dockwall. The device of the '847 patent has a frame vertically extending up the dockwall and secured to the exposed surface of the wall. It has a hook assembly that has a follower mounted in the frame for vertical movement between an upper operative position, where it will se-

cure the vehicle against the wall, and a lower inoperative position free of the vehicle so that the vehicle can be driven away from the wall. The hook assembly has a horizontal shank portion extending outwardly from the follower and a vertical hook portion. The device of the '847 patent further has a retaining means to retain the hook in its upper operative position but to selectively permit the hook to be released to its lower inoperative position.

27. In addition to the above-described basic structure, the device of the '847 patent includes a slide as a part of the fixed wall-mounted frame, which is urged upwardly by a biasing force and has a first part of the retaining means secured to it. A coacting complimental second part of the retaining means is carried by the hook and engages the first part to prevent accidental movement of the hook from an operative to an inoperative position. Thereby, any loading of the vehicle, such as upon the entry of a forklift truck, will cause the hook, the slide, and the two parts of the retaining means to move together downwardly against the biasing force of the spring to provide downward float. This is a desirable feature, for without it, the device could become "jammed" by the weight of the truck pushing down on the hook assembly engaged with the ICC bar. This downward float is made possible by heavy duty springs which hold the slide so that the slide and the first part of the retaining means are upwardly biased even when not restraining a vehicle. As a result, the retaining means and the hook element can move, as a unit, several inches vertically downward when subjected to the forces of a truck being loaded.

28. While, in the preferred embodiment described in the '847 patent, the first part of the retaining means is a ratchet and the second part is a pawl, the description in column 2 starting at line 2 makes it very clear that the patent is not limited to this particular embodiment. At column 3, line 5, the description makes it clear that other equivalent devices, and in particular elongated vertically extending devices, could be employed instead of a ratchet. At column

4, lines 9–10, the description makes it equally clear that other equivalent devices could be substituted for the pawl. From the testimony of both experts, the Patent Office prosecution history, and the other evidence, it is clear that the rack and pinion of Kelly and the threaded shaft of the Taylor, et al., reference, cited by the Examiner, are the equivalent of the ratchet and pawl shown in the particular embodiment described in the '847 patent.

29. Recognizing the advancement in the art of vehicle restraints represented by the MDL Dock-Lok, Rite-Hite sought and obtained the '847 patent disclosing and claiming this system. A physical MDL truck restraint constructed in accordance with the described embodiment of the '847 patent (PTX–20) was demonstrated at trial and was also compared to the Model MDL–55 (PTX–123) and the Kelley Truk Stop (PTX–21) systems. The claimed elements in Claims 1, 2, 3, 8, 12, and 13 of the '847 patent are found in the MDL, the MDL–55, and the Kelley Truk Stop. Mr. Kjell Erlandsson, who is Kelley's Vice President of Engineering and who testified as an expert witness for Kelley at trial, questioned whether the word "releasably" was apt in finding that the Kelley rack and pinion releasably retained the hook in its operative position. The term is apt as indicated by the use of the term "Release" on the Truck Stop control box for the purpose of lowering the hook to release it from engagement with a vehicle.

30. The value of the invention of the model MDL and '847 patent is not limited to simplicity of construction or the possibility of manual operation. The vertically traveling hook assembly is a new departure from and an improvement over previous "pivoted hook" designs in part because the capture area available to engage an ICC bar by the hook was changed to a rectangular area from the smaller semi-circular area provided by the pivoting hook, resulting in a better range of engagement. Also, the vertically travelling hook assembly has a smaller sweep or clearance area moving into the operating position to reduce the

chance of interference with things other than the ICC bar. In addition, the pivoting hook has a tendency to rotate away, whereas there is no such concern with the vertically moving hook assembly. Mr. Erlandsson made these observations at his deposition and continued to acknowledge these advantages at the trial. In addition, the Model MDL can be used either with or without a power source.

### F. *The '847 Patent Was Commercialized As the MDL–55*

31. Rite-Hite had successfully tested production prototypes, was completing production drawings and obtaining quotes on large production quantities of parts when Messrs. Hip, Hahn, and Swessel in mid-1981 came up with an improved version, the MDL–55. Although the basic device shown in the '847 patent had downward float, this unit did not have what people in the industry today call "upward" float, i.e., the hook is not initially springbiased up against the ICC bar. At the trial, the evidence established that normal "over-the-road" trucks deflect between about 1 inch and 2½ inches, so that in most situations, the vertical hook portion of the hook assembly shown in the '847 patent would accommodate the upward float of the ICC bars. The vertical hook portion of the hook assembly could also, of course, have been made longer to provide additional compensation for the "upward float" of the ICC bar.

32. With the improvement of the MDL–55, if the ICC bar rises as weight is taken off the truck, an initial bias is provided that can raise the vertically movable hook. This increased the versatility of the vertically moving hook. The improved restraint handles not only "over-the-road" trailers but "city" trucks (a small percentage of the vehicles to be restrained), which generally have weaker springs and, thus, deflect more than the "over-the-road" trailers. This improved MDL device, the Model MDL–55 vehicle restraint, is disclosed and claimed in U.S. Patent 4,443,150 (PTX–1i).

This model was also demonstrated at the trial (PTX–123).

33. Kelley did not dispute that this improved model MDL–55 device uses the '847 patent and has been commercialized by Rite-Hite and is a current successful product of Rite-Hite. Over 1,800 of the MDL–55's have been sold, generating sales in the millions of dollars.

34. Similarly, the Kelley Truk Stop uses the '847 patent, but by using a motor and rack and pinion instead of the ratchet and pawl of the specific embodiment of the '847 patent, Kelley obtains the same advantages as the MDL–55's initial upward float. Kelley's Truk-Stop is additional evidence of the commercial success of the invention of the '847 patent. While one can never be certain of the precise causal relationship of commercial success, nevertheless in this case, it appears from all of the evidence that the invention of the '847 patent was a very significant factor.

### G. *Kelley's Development of Its "Truk Stop" Device*

35. The facts established at trial indicate that Kelley learned about and made its vertically moving hook through its examination and adoption of the Rite-Hite MDL–55 device and the related literature.

36. Kelley's imitation of the vertically moving hook and the other elements of the '847 patent is indicative of the value, the importance, and the unobviousness of the invention claimed in the '847 patent. Furthermore, the fact that Kelley has procured U.S. Patent 4,488,325 (DTX–212), on aspects of its vehicle restraint, does not negate the infringement of Rite-Hite's '847 patent. The very foundation of the patent system contemplates that users of a basic patent will make improvements with time. Both Kelley and Rite-Hite did so here, but if anything, that enhances the dignity of the '847 patent.

37. Kelley's first knowledge of a workable vehicle restraint came with the introduction of the ADL–100 Dok-Lok sold by Rite-Hite in April of 1980. In June of 1980, Kelley's response to this first device of

Rite-Hite was to propose various communications devices (PTX–64). One year later, in June of 1981, Kelley was still working on communications-type devices (PTX–65).

38. In the late summer of 1981, about the time of the introduction of Rite-Hite's Model MDL–55, the Occupational Safety and Health Administration ("OSHA") issued an instruction (PTX–30), the purpose of which was to allow the use of vehicle restraints without wheel chocks.

39. At about this same time, Kelley's sales representatives began expressing increased concerns to Kelley (which was still without a vehicle restraint in its product line) that sales of Rite-Hite's vehicle restraints could be coupled with sales of Rite-Hite dock levelers which would otherwise be sold by Kelley (PTX–36). This was a double injury in the market place. As a result, the representatives found that their ability to sell dock equipment was hampered by the presence of Rite-Hite vehicle restraints.

40. Kelley had no plans for a physical restraint at the time of the OSHA instruction. Rather, Kelley's focus was still on communication. Knowing of the long-standing problem, Kelley had failed to recognize the solution.

41. On Friday, November 13, 1981, John Hogseth (Kelley's Vice President of Marketing) sent a memo to Joseph Driear (Kelley's Director of Engineering) formally requesting Mr. Driear to begin work immediately on a vehicle restraint to compete against the Rite-Hite Dok-Lok and to cost less than $1,000 (PTX–32). During the course of this program, Kelley personnel referred to its vehicle restraint as "Kelley's version of the Dok-Lok" (PTX–36).

42. On the following Monday, November 16, 1981, Hogseth's memo (PTX–32) was marked "received" by "Engineering," and a memo at the bottom in Mr. Driear's handwriting of the same date indicates that Mr. Driear would comply with Mr. Hogseth's requests but that the following were initially required:

(a) Engineering needed a copy of the OSHA regulations that sanction the use of vehicle restraints (this was done four days later as noted below);

(b) The formal "request" for the product development program should be submitted (there is evidence that this was, apparently, never done);

(c) A copy of the "complete" Rite-Hite literature should be sent to Engineering (the operating instruction sheet for the MDL–55 had been received by Engineering on September 17, 1981, as an attachment to a memorandum from Hogseth (PTX–31), but other literature, such as an ADL–100 booklet, was not provided until later); and

(d) A sample of the Rite-Hite product should be made available to Engineering (this was done on December 30, 1981, as described below).

43. On the next day, Mr. Driear carefully reviewed copies of certain Rite-Hite patents, including the patent claiming the Model ADL–100 restraint (with a pivoting hook), and made notes regarding the claims of the patents (PTX–33). His notes all portray, among other things, the "pivoted hook" configuration shown in the Rite-Hite patents.

44. About that time, Kelley's patent attorney, Glenn Starke, visited Mr. Driear, and they discussed the Rite-Hite patents. Although the Model MDL–55 devices were marked "patent pending" (PTX–93), no search or study was made or opinion given on what patents might issue on the MDL–55.

45. Also, at about this time, the vehicle restraint development project of Kelley was assigned the project number "915" and was assigned to David Bennett, a young engineer working under Mr. Driear's supervision. Mr. Bennett is now deceased. Kelley continued to work on communications-type systems (PTX–65).

46. A date stamp on the OSHA instruction indicates that it was received by Kelley's engineering department on Friday, November 20, 1981 (PTX–30).

47. On December 29, 1981, Mr. Bennett wrote a memo in longhand setting forth the

"work schedule" for the "trailer anchoring device" (PTX–38). The memo sets forth a number of tasks which indicate that little, if any, progress had been made in the design work up to this point, and a high priority had been given to obtaining additional information on Rite-Hite's product. A memo and monthly report dated January 14, 1982, from Mr. Driear to Mr. Kuhns (PTX–58), also generally summarizes the work done on project 915 during December of 1981 as follows: "Conceptual work on truck/trailer anchoring device proceeded slowly due to higher priority projects." Thus, at the end of 1981, Kelley was still without a defined concept or significant development of vehicle restraint to compete with Rite-Hite.

48. On December 30, 1981, the previously ordered Model MDL–55 Dok-Lok vehicle restraint was finally installed at Kelley's Tuf-Seal subsidiary (PTX–129). An hour after the installer left, the Kelley engineers, including Mr. Driear, began inspecting, disassembling, measuring, operating, and photographing it. Polaroid photographs of the device were taken then and later placed on file in Kelley's engineering division (PTX–22 through PTX–29). These photographs, discussed at trial, show Mr. Driear at the site of the installation (PTX–26), the disassembled vehicle restraint as well as with a tape measure (PTX–24 and PTX–29) next to certain parts. One of these photographs shows the serial number tag on the device (PTX–26). At that time these tags indicated that patents were pending on the device (PTX–93).

49. Messrs. Bennett and Driear knew, or had available to them as of the end of December 1981, everything that was possible for them to know about the construction of the Rite-Hite Model MDL–55. They knew the fact that it had a vertical support, a channel in the support for a slide, a hook mounted for vertical movement in the support, and a ratchet and pawl assembly that operates by relative movement to position the hook on the slide, retain it in the position, and permit downward float of the slide, hook, and retaining means as a unit against a biasing force.

50. On the next day, Robert Kuhns sent a memo (PTX–55) to Mr. Driear and a copy of a publication draft of a Model ADL Service Bulletin that Kelley had obtained on May 5, 1980, stating:

> With this (I think George Zahorik has the original) and the Tuf-Seal Mechanical [MDL Dok-Lok], we should be able to move.

51. By January 12, 1982, the first sketches that have been found of Kelley's device, which embodied all of the features of Rite-Hite's device described above and claimed in the '847 patent claims 1, 2, 3, 8, 12, and 13, were complete. These first sketches show the product that was eventually commercialized as the Truk Stop.

52. At the trial, Kelley claimed that these January sketches were not the earliest sketches and that they had previous sketches and work. However, Kelley was unable to produce any earlier sketches showing a device similar in any way to its Truk Stop, notwithstanding numerous requests made by Rite-Hite's counsel before and during the trial. In fact, on January 15, 1982 (PTX–57), these sketches were signed and witnessed by Kuhns and Driear. Furthermore, the evidence established at trial indicates that Kelley's practice is to have the first description or sketch of an invention witnessed so as to corroborate the date and provide credible evidence of the date of the invention. Thus, based upon this evidence, the earliest sketches of the Truk Stop device were not made by Kelley's engineers until about two weeks after Kelley's same engineers viewed, operated, and disassembled Rite-Hite's MDL–55.

53. By February 23, 1982, the first prototype of Kelley's Truk Stop restraint was complete, operating, and ready for testing. Photographs of this prototype (PTX–43) were taken by Kelley specifically for the purpose of establishing this date.

54. On March 1, 1982, the design of the Truk Stop product was released at a "show and tell" demonstration, and by about July 1, 1982, the product was available for intro-

duction to the representatives and production, shortly after the date projected by Kelley in the fall of 1981 (PTX–32).

55. The evidence at trial, both through the testimony of Kelley's personnel and its documentation, shows that Kelley had given a great deal of thought to the question of a product that would compete with Rite-Hite's vehicle restraint, and that Kelley had made little progress in its own efforts to come up with a competing device until after its engineers had the benefit of the MDL–55 Dok-Lok brochures and inspected, tested, and dismantled an actual MDL–55.

56. The testimony at trial of Robert Engleking, a Kelley sales representative in Minneapolis in 1981 and 1982, was uncontroverted. That evidence showed the commercial impact of the Rite-Hite Dok-Lok restraints, the need for such device, and the response of Kelley. Mr. Kuhns, President of Kelley, during a private showing of the new Truk Stop in the spring of 1982, demonstrated it side by side with Rite-Hite MDL–55 and explained the relationship between them to Mr. Engleking.

## H. *Kelley Has Failed to Prove That the '847 Patent Is Invalid*

57. Kelley has asserted invalidity of the claims in suit of the '847 patent, stating that the claimed combination is obvious and shown in the prior art. The Court finds that Kelley has failed to carry forth its burden that the patent is invalid and holds that the claims in suit are not invalid.

### a. *The Claimed Invention Is Nonobvious*

58. Kelley has alleged that the asserted claims are obvious over the prior art. On this issue the Court has (1) determined the scope and content of the prior art, (2) ascertained the difference between the prior art and subject matter claim, (3) determined the level of ordinary skill in the art, and (4) given consideration to the objective evidence of nonobviousness such as long-felt need, commercial success, failure of others, copying, and unexpected results. Based upon the evidence coupled with an analysis

of this indicia, the Court finds that the subject matter of claims 1, 2, 3, 8, 12 and 13 are nonobvious.

59. Kelley set forth a number of prior art references during the trial. Many of these references were before the Examiner and some of them were not. With respect to the references not before the Examiner, the Court finds that none of these are more pertinent than the art before the Examiner. Along these lines, the Court rejects Mr. Erlandsson's testimony that U.S. Patent 4,282,621 (PTX–1–g), which issued to Anthony, et al., for a Releaseable Locking Device and which was not before the Examiner, is more pertinent than U.S. Patent 4,264,259 (PTX–1–e), issued to Mr. Hipp for a Releaseable Locking Device; U.S. Patent 4,267,748 (PTX–1f), issued to Grunewald, et al., for a Releasable Locking Mechanism; and U.S. Patent 4,208,161 (PTX–1d), issued to Mr. Hipp, et al., for Device For Releasably Securing A Vehicle To An Adjacent Support, all of which were cited by the Examiner. All of these patents, discussed earlier, resulted from the Rite-Hite vehicle restraint program. The '621 patent teaches no more than the '259, '748, or '161 patents, which were before the Examiner.

60. The plethora of references set forth by Kelley in general fall into two categories. The first category contains ratchet and pawl references shown in a montage (DTX–202). The reliance on these references is based upon Kelley's misapprehension of the claims as being specific to a ratchet and pawl as an element of the claimed combination. None of the claims is limited to a ratchet and pawl, and Rite-Hite never contended it had invented a ratchet and pawl. Kelley put in no evidence that any of the ratchet and pawl references suggested use of that element in the claimed combination to secure a parked vehicle against a stationary upright structure such as a dock wall. Thus, none of the prior art items in DTX–202 is of significance in the issue of obviousness.

61. The second category of prior art is that shown in DTX–201. These references all relate to some type of vehicle restraint,

but none shows the claimed combination of the '847 patent. The closest references to the asserted '847 patent claims are the work of Rite-Hite's development team. None of those references suggest going to the system of the '847 claims with a horizontal hook shank mounted to a follower to a vertical support or with a biased slide and retaining means for the vertically movable hook. Nor do those references suggest a slide, a vertically movable hook in the slide and retaining means to support the hook fixed in the slide, all vertically movable as a unit to provide float.

62. The examiner had the best of these references before him; that is, Rite-Hite's '259, '161, and '748 patents showing pivotally mounted hooks on a vertical wall. The Examiner was correct in finding the '847 claims unobvious and patentable thereover. While each single element of the claims may have precedent in the prior art, as is true in most mechanical patents, the combination of elements set forth in the claims of the '847 patent asserted here was novel. It proved a workable, efficient, and inexpensive solution to a very long-felt need in the dock equipment industry and was not suggested in any reference. Kelley was well aware of the serious safety hazard, including injuries and even deaths, from inadvertent and accidental withdrawals of trucks from loading docks and the need for a practical solution since at least as early as 1966 when they sought patent protection on what they called the Panic Stop (DTX–183–8).

63. There was some disagreement between the parties at the trial about the level of ordinary skill in the art in the early 1980's. The Court adopts the definition of plaintiffs' technical expert witness Professor John Strait who stated that the level of skill is relatively low, and that a person with several years of design experience in the steel and machinery art would typify the ordinary skill. A few of the workers in the art, usually managers, might have an engineering degree. With this definition, the Court finds that the claimed combination would not have been obvious to one skilled in the art at the time of the invention.

64. Even if this Court adopts Kelley's definition of the higher level of skill (a qualified engineer) suggested by Kelley's expert witness, Mr. Erlandsson, this Court finds that this invention would have been nonobvious.

65. This finding of nonobviousness is further supported in light of the objective evidence of unobviousness. For example, the '847 patent provided a solution to the long-felt need that escaped the industry, including Kelley, until after Hipp and Hahn made the invention and Rite-Hite began to sell the invention of the '847 patent as the Model MDL–55 vehicle restraint. Before that time, Kelley concentrated its efforts on communications devices and not physical restraints, and even when charged with coming up with physical restraints, it was unable to do so.

66. A further indicium of nonobviousness is copying or imitation by competitors. In this case, Kelley was not able to come up with a solution or a construction for a physical restraint on its own prior to receiving the Rite-Hite MDL–55 literature in the late summer of 1981 and having the MDL–55 installed on the dock of its Tuf-Seal subsidiary on December 30, 1981. Kelley's officers and engineers, within hours after the Rite-Hite installation was completed at Tuf-Seal, were inspecting, operating, photographing, disassembling, and measuring the Rite-Hite MDL–55. Within a few weeks thereafter, the Kelley documentary records show the first evidence of the development of the truck restraint that became the Truk Stop, including a witnessed drawing (PTX 57) and other subsequent indications of the construction of the first prototype, which was made in February of 1982 (PTX 43). Such evidence further supports the argument of unobviousness.

67. As mentioned earlier, while it is never possible to relate commercial success to one specific cause, the invention encompassed by the '847 patent is one significant cause that has resulted in the commercial success of both the MDL–55 of Rite-Hite and the Kelley Truk Stop.

68. Kelley claims that the commercial Rite-Hite product, the MDL–55, also incorporated an improvement over the basic disclosure of the '847 patent. It is, of course, axiomatic in the patent law that one cannot avoid infringement of a basic patent, such as the '847 patent, by making certain improvements on the basic structure, such as the addition of a motor drive or means for providing increased float as compared to the structure of the '847 patent. Similarly, the fact that Rite-Hite's commercial product represents an improvement that came after the basic invention of the '847 patent in no way detracts from the commercial success of the patented structure.

### b. *Kelley Has Failed to Prove Anticipation*

69. Kelley has also alleged that the asserted claims are shown by the prior art, although its evidence was vague on whether it alleged an anticipation under any section of 35 U.S.C. § 102. The Court finds that Kelley has failed to carry forth its burden on this allegation.

70. In particular, at the trial, Kelley's technical expert, Mr. Erlandsson, stated that prior art, such as U.S. Patent 621,858 issued to Schwarz for Easel and a 1977 Ford Automobile Jack and operating manual, show the claimed combination in the asserted claims. Yet these prior art devices do not relate to the patented invention. They are far afield and offer no suggestion of an apparatus for restraining a parked vehicle against a stationary upright structure. No single reference introduced by Kelley anticipates the claimed invention. Even if these devices include each of the claimed mechanical elements, their structure, interrelationship, application, and operation vary so drastically and distinctly from the claimed invention that it cannot be found that these devices show the claimed combination.

### I. *Kelley's Infringement of the '847 Patent*

71. Infringement of Claims 1, 2, 3, 8, 12, and 13 of the '847 patent by the Kelley vehicle restraint marketed under the trademark "Truk Stop" was proven at trial. To facilitate reading these claims, they were broken down at trial and compared with features and elements of the Kelley device. Rite-Hite's technical expert witness, Professor Strait, explained the relationship at the trial with the assistance of colored charts of the '847 patent drawings (PTX–10) and Kelley's device (PTX–14) as well as demonstrations of various models. In particular, Professor Strait showed how the asserted claims of the '847 patent read on the drawings of the '847 patent (PTX–10 and PTX–10–A), the Model MDL (PTX–19), the Model MDL–55 (PTX–123) (the improved Model MDL, which has met with commercial success in the marketplace through sales of over 1,800 units), and Kelley's Truk Stop device (PTX–21).

72. Claims 1, 2, 3, 8, 12, and 13 of the '847 patent, as asserted against Kelley's product and in the form as relied upon by the plaintiffs at trial in PTX 11, 12, and 13, are as follows:

CLAIM 1

A releasable locking device for securing a parked vehicle to an adjacent relatively stationary upright structure, said device comprising

(a) a first means mountable on an exposed surface of the structure,

(b) a second means mounted on said first means for substantially vertical movement relative thereto between operative and inoperative modes,

(c) the location of said second means when in an inoperative mode being a predetermined distance beneath the location of said second means when in an operative mode and in a non-contacting relation with the vehicle,

(d) and third means for releasably retaining said second means in an operative mode,

(e) said second means including a first section projecting outwardly a predetermined distance from said first means and the exposed surface of the structure, one

end of said first section being mounted on said first means for selective independent movement relative thereto along a predetermined substantially vertical path, and a second section extending angularly upwardly from said first section and being spaced outwardly a substantially fixed distance from said first means and the exposed surface of the structure,

(f) said second means, when in an operative mode, being adapted to interlockingly engage a portion of the parked vehicle disposed intermediate to second section and said first means,

(g) said second means, when in an inoperative mode, being adapted to be in a lowered nonlocking relation with the parked vehicle.

CLAIM 2

The device of claim 1 wherein

(a) the first means includes a first member fixedly mountable on the structure exposed surface and a second member slidably mounted on said first member for limited independent substantially vertical relative movement,

(b) said second member being upwardly biased to assume a normal elevated rest position with respect to said first member,

(c) said second member and said second and third means being movable as a unit downwardly from said normal rest position only when a depressive external force exerted on said second means, while the latter is retained in an operative mode, exceeds the biasing force applied to said second member.

CLAIM 3

The device of claim 2 wherein

(a) the third means includes a first element carried by said second means and coacting with a complemental second element carried by the second member of said first means to prevent movement of said second means from an operative mode to an inoperative mode.

CLAIM 8

The device of claim 1 wherein the third means automatically retains the second means in an operative mode.

CLAIM 12

The device of claim 1 wherein

(a) the first means includes elongated upright guide means,

(b) and the first section of the second means includes guide-engaging elements carried on the one end of said first section and continuously maintaining said first section in an outwardly projecting relation with respect to said first means.

CLAIM 13

A releasable locking device for securing a parked vehicle to an adjacent upright structure, said device comprising

(a) a first means having a first member fixedly mountable on the structure and a second member mounted on said first member for limited substantially vertical relative movement, said second member being upwardly biased to assume a normal rest position,

(b) second means mounted on said first means for substantially vertical movement relative thereto between operative and inoperative modes,

(c) the location of said second means when in an inoperative mode being a predetermined distance beneath the location of said second means when in an operative mode,

(d) and third means for releasably retaining said second means in an operative mode,

(e) said third means having a first element carried by the second member of said first means, and a complemental second element carried by said second means, said first and second elements coacting with one another to prevent movement of said second means from an operative mode to an inoperative mode,

(f) said second means including a first section projecting outwardly from said first means, one end of said first section being connected to said first means and being guided thereby for selective relative movement in a predetermined substantially vertical path, and a second sec-

tion extending angularly upwardly from said first section and being spaced outwardly from said first means,

(g) said second means, when in an operative mode, being adapted to interlockingly engage a portion of the parked vehicle disposed intermediate the second section and said first means,

(h) said second means, when in an inoperative mode, being adapted to be in a nonlocking relation with the parked vehicle,

(i) the second member of said first means being movable downwardly from the normal rest position only when a depressive external force exerted on said second means, while the latter is retained in an operative mode, exceeds the biasing force applied to said second member.

73. Upon hearing all of the evidence presented at the trial, including the expert testimony of both Professor Strait (Rite-Hite's technical expert) and Mr. Erlandsson (Kelley's Vice President of Engineering and its technical expert), the Court finds that Claims 1, 2, 3, 8, 12, and 13 of the '847 patent are infringed by Kelley's device.

74. In particular, Professor Strait showed that the Kelley device, which is directed to a releasable locking device or vehicle restraint for securing a parked vehicle to an adjacent upright structure, such as a dockwall, has a frame vertically extending up the dockwall and secured to the exposed surface of the wall, a hook assembly slidably mounted in that frame for vertical movement between an upper operative position where it will secure the vehicle against the wall and a lower inoperative position free of the vehicle so that the vehicle can be driven away from the wall. The hook assembly of the Kelley device also has a horizontal shank portion, a vertical hook portion, and a follower that moves in the frame between the upper operative and lower inoperative positions. The Kelley device also has a means in the form of a rack and pinion which operates with a reversible motor to retain the hook in its upper operative position but to selectively permit the hook to be released to its inoperative position.

75. In addition, at the trial Professor Strait showed that the Truk Stop unit also includes a slide as a part of the fixed frame, which is urged upwardly by a biasing force in the form of a gas spring and has one part of the locking means, namely, the rack secured to it. A coacting complemental part of the retaining means, the pinion, is carried by the hook and engaged the rack to prevent accidental movement of the hook from an operative to an inoperative position. As a result, the Truk Stop will move downward when subject to the force of a truck being loaded providing downward "float." Upward float can also be accommodated by the Truk Stop unit. When the ICC bar moves upward, the motor is activated and the hook moves up with the ICC bar.

76. During Mr. Erlandsson's cross-examination, the following chart (PTX–136) was developed with respect to Claims 1, 2, 3, 8, and 12:

| CLAIM PART | KELLEY COLOR | RITE–HITE COLOR | '847 PATENT | TRUK STOP |
|---|---|---|---|---|
| **FIRST MEANS** | | | | |
| First Member | Light Blue | Brown | Frame | Frame |
| Second Member | Dark Blue | Orange | Slide | Slide |
| **SECOND MEANS** | Yellow | Yellow | Hook Assembly | Hook Assembly |
| **THIRD MEANS** | | | | |
| First Element | Dark Red | Green | Pawl | Pinion & Worm |
| Second Element | Light Red | Purple | Ratchet | Rack |
| **BIASING FORCE** | Orange | Blue | Spring | Spring |

This chart shows the direct correlation of the '847 patent claim elements and the Truk Stop elements.

77. The Truk Stop device also has a reversible motor that is part of the retaining means. Kelley argued at the trial that its use of a rack and pinion, where the pinion is "driven" up the rack by a motor, avoids infringement of the asserted claims because the third means for releasably retaining the hook in an operative mode as recited in the claims did not cover the Kelley device. Kelley argued further that because a secondary objective of the Rite-Hite patent is to provide a device that does not require an electrical power source to operate, the claims are thereby limited to manual devices. The Court does not find either of Kelley's arguments persuasive.

78. First, the broader claims that are asserted here are not, in any way, limited to a ratchet and pawl. In fact, "means plus function" language is used which is directed to a desired result, i.e., "third means for releasably retaining said second means in an operative mode." During the trial, Kelley's expert witness continued to apply the doctrine of equivalents test with respect to interpreting means plus function language. This is not the proper test. Rather, to interpret these functional claims, reference must be made to the last paragraph of 35 U.S.C. § 112. That paragraph states that the patentee is entitled to a claim covering the means described in the specification and equivalents that perform the stated function. The rack and pinion is interchangeable with a ratchet and pawl and is the clear equivalent of a ratchet and pawl for releasably retaining the hook in its operative position. *Palumbo v. Don-Joy Co.*, 762 F.2d 969, 976 (Fed.Cir.1985). To hold otherwise would nullify § 112. *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed.Cir.1985).

79. This finding, with respect to the scope of the "means plus function" language, is buttressed by the fact that other claims in the '847 patent, which are not asserted here, specifically recite a ratchet and pawl. To limit the broader claims, in the way Kelley asked this Court to do, would go against a rational construction of the claims.

80. Furthermore, the claims are not limited to a manual device because only one of

many objectives set forth in the specification is to provide a device that is free of an electrical source. Nonasserted claims specifically recite manual operation, and thus such a limitation cannot be read into the asserted claims.

81. Even without literal infringement, the Court finds that Kelley's device infringes the asserted claims under the doctrine of equivalents. This is so because the Kelley device performs the same function in substantially the same way to achieve substantially the same result as the claimed subject matter of the '847 patent.

82. At the time Kelley undertook the development of its truck restraint, it requested its patent counsel to make a search of all Rite-Hite patents dealing with truck restraints, and Kelley received a written opinion from counsel that all of the Rite-Hite patents then issued were limited to a pivoting hook. Based on this opinion, Kelley proceeded to develop a truck restraint that did not use a pivoting hook in order to avoid conflict with the Rite-Hite patents. The '847 patent did not issue until almost a year after Kelley began to market its Truk Stop truck restraint. Kelley never made an infringement search beyond the six patent numbers that Kelley found listed on the Rite-Hite device's serial number tags. Nor did Kelley ever cause its counsel to make an infringement search to determine what patents might exist or might be infringed by its Truk Stop restraint. Furthermore, Kelley never obtained an opinion from its counsel on the probability or possibility of patents issuing on the MDL–55.

J. *The Unfair Competition Claims and Counterclaims*

83. On March 16, 1984, the Court preliminarily enjoined Kelley from using its Truk-Stop promotional motion picture, that motion picture having been found to be misleading in its depiction of Kelley's and Rite-Hite's truck restraining devices.

84. Based on the testimony of Robert Kuhns that Kelley has taken the original motion picture off the market, has replaced it with a film loop which is acceptable to Rite-Hite, and has no intention of showing or using the original motion picture that this Court found misleading, the Court finds there is no need for any injunctive relief at this time and that the preliminary injunction may be dissolved.

85. At trial, the parties introduced evidence on their respective claims and counterclaims of unfair competition against each other. This evidence failed to establish any need for other injunctive relief or money damages on the part of either party.

## II. CONCLUSIONS OF LAW

### K. *Source of Applicable Law*

86. This court has jurisdiction over the parties and the subject matter, and venue is proper. The law applicable here is that of the United States Court of Appeals for the Federal Circuit and its predecessor courts, the Court of Customs and Patent Appeals and the Court of Claims. *South Corp. v. United States*, 690 F.2d 1368, 1369, 215 U.S.P.Q. 657 (Fed.Cir.1982).

### L. *Validity of Patents*

87. Section 282 of the United States patent laws (35 U.S.C. § 282) explicitly states that a patent shall be presumed valid, and this presumption attaches to each claim independently of the other claims. *Jones v. Hardy*, 727 F.2d 1524, 1528, 220 U.S.P.Q. 1021, 1024 (Fed.Cir.1984). Moreover, this presumption encompasses presumptions of novelty, nonobviousness, and utility—each of which are presumed to be present. *Structural Rubber Products Co. v. Park Rubber Co.*, 749 F.2d 707, 714, 223 U.S.P.Q. 1264, 1269 (Fed.Cir.1984). This statutory presumption of validity places the burden of proving facts establishing invalidity by clear and convincing evidence on the party asserting invalidity. *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 894, 221 U.S.P.Q. 669, 674 (Fed.Cir. 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984).

## M. *Nonobviousness*

88. It is a condition of patentability that the invention be nonobvious, 35 U.S.C. § 103. The statutory presumption of patent validity carries with it a presumption of nonobviousness. *Structural Rubber Products Co.*, 749 F.2d at 714.

89. In *Graham v. John Deere & Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545, 148 U.S.P.Q. 459, 467 (1966), the Court mandated, in determining obviousness/nonobviousness under § 103 of the patent laws, that factual inquiries be made into: (1) the scope and content of the prior art; (2) the level of ordinary skill in the pertinent art at the time the invention was made; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness, e.g., long-felt needs, commercial success, failure of others, copying, and unexpected results. *Perkin-Elmer Corp.*, 732 F.2d at 894; *Jones*, 727 F.2d at 1527, 1529–31; *Environmental Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 695–97, 218 U.S.P.Q. 865, 867–69 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). The invention of Claims 1, 2, 3, 8, 12, and 13 of the '847 patent would not have been obvious as a whole to a person of ordinary skill in the art in the spring of 1981.

### a. *The Invention As a Whole Compared to the Prior Art*

■ 90. Section 103 requires the consideration of whether the invention would or would not have been obvious "as a whole" to one of ordinary skill in the art to which that subject matter pertains at the time the invention was made. *Perkin-Elmer Corp.*, 732 F.2d at 894; *Jones*, 727 F.2d at 1529. Failure to consider the claimed invention "as a whole" would be an error of law. *W.L. Gore & Associates Inc. v. Garlock, Inc.*, 721 F.2d 1540, 220 U.S.P.Q. 303, 309 (Fed.Cir.1983), *cert. denied*, —— U.S. ——, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). In this case, there was no real vehicle restraint art or industry when Rite-Hite introduced its first Dok-Lok restraint. The "art" consisted of the work of Rite-Hite's development team as exemplified in Rite-Hite's earlier patents.

■ 91. Factors that are considered in determining the level of "ordinary skill in the art" may include: (1) the educational level of one of ordinary skill; (2) the types of problems encountered in the art; (3) the prior art solution to those problems; (4) the rapidity with which innovations are made; and (5) the sophistication of the technology. Not all of these factors need be considered in every case, and often one or more factors may predominate or are given more weight in a particular case. *Environmental Designs*, 713 F.2d at 696–97.

92. Additionally, although it is proper to note the difference existing between the claimed invention and the prior art, because that difference may serve as one element in determining the obviousness/nonobviousness issue, it is improper merely to consider the difference as the invention. The "difference" may appear to be slight, but it can be the key to success and advancement in the art. Furthermore, it is irrelevant in determining obviousness that all or all other aspects of the claimed invention are well known, in a piecemeal manner, in the art, since virtually every patent can be described as a "combination patent" or a "combination" of old elements. *Jones*, 727 F.2d at 1528. There is absolutely no basis in the law for treating combinations of old elements differently in determining patentability. *Fromson*, 755 F.2d at 1555–56.

■ 93. Moreover, the mere fact that the disclosures or teachings of the prior art can be retrospectively combined for purposes of evaluating the obviousness/nonobviousness issue does not make the combination obvious unless the art also suggested the desirability of the combination or the inventor's beneficial results or the advantage to be derived from combining the teachings. *Fromson*, 755 F.2d at 1556; *In re Sernaker*, 702 F.2d 989, 995–96, 217 U.S.P.Q. 1, 6–7 (Fed.Cir.1983); *In re Imperato*, 486 F.2d 585, 587, 179 U.S.P.Q. 730,

732 (CCPA 1973). There is no such suggestion in this case.

94. In *Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co.*, 730 F.2d 1452, 221 U.S.P.Q. 481 (Fed. Cir.1984), a patent for hydraulic scrap shears was held valid and nonobvious even though it specifically stated in the specification that it disclosed and claimed a combination of features previously used in two separate prior devices. The Court explained:

> Nothing in the references alone or together suggests the claimed invention as a solution to the problem of crushing rigidly massive scrap. There was nothing whatever of record, therefore, to support the district court's statement that the claimed machine possessed "another known procedure operating in a known manner to produce a known result" or its conclusion that Lindemann (the inventor) knew...that a small sidewall ram could most economically process large scrap.

*Lindemann*, 730 F.2d at 1462.

95. Thus, even if all the elements recited in the claims of the '847 patent were in existence at the time of the invention, the fact remains that the combination of these elements for the purpose as set forth in the claims is nowhere suggested and is a nonobvious advance in the art of vehicle restraints.

### b. *The Advance in the Art Provided by the Invention in Suit*

■ 96. The objective evidence of nonobviousness discussed by the Court in *Graham* may be the most pertinent, cogent, probative, and revealing evidence available to aid in reaching a conclusion on the obviousness/nonobviousness issue and is of substantial significance in this case. *Simmons Fastener Corp. v. Illinois Tool Works, Inc.*, 739 F.2d 1573, 1575–76, 222 U.S.P.Q. 744, 746–47 (Fed.Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 2138, 85 L.Ed. 496 (1985). In fact, such evidence of the objective considerations must be considered as part of all the evidence in all cases. *In re Piasecki*, 745 F.2d 1468, 1471,

223 U.S.P.Q. 785 (Fed.Cir.1984). These tests include:

(1) Did the patented invention fulfill a long-felt need in the industry to which it applied? *Ortho Pharmaceutical Corp. v. American Hospital Supply Corp.*, 534 F.2d 89, 93, 190 U.S.P.Q. 397, 400–01 (7th Cir.1976); *Rex Chainbelt, Inc. v. General Kinematics Corp.*, 363 F.2d 336, 337, 150 U.S.P.Q. 319, 320 (7th Cir. 1966).

(2) Did others try and fail to meet the need that the invention ultimately satisfied?

(3) Did the patented invention meet with substantial success upon its introduction to the market? *Rex Chainbelt, Inc.*, 363 F.2d at 337; *Continental Can Co. v. Anchor Hocking Glass Corp.*, 362 F.2d 123, 124, 150 U.S.P.Q. 1, 2 (7th Cir.1966).

(4) Did the accused infringer recognize that the invention was truly meritorious? *AMP, Inc. v. Molex Products Co.*, 329 F.Supp. 1364, 1371, 170 U.S.P.Q. 2, 7 (N.D.Ill.1971).

97. Evidence may often establish that an invention which appeared at first blush to have been obvious was not in view of the secondary considerations. *Fromson*, 755 F.2d at 1556. When a structure such as the '847 patent goes undiscovered for years and then enjoys substantial commercial success, there is strong evidence of unobviousness.

98. One cannot escape the fact that the solutions to dock hazards by preventing vehicle separation eluded the industry for years. Rite-Hite's invention claimed in the '847 patent satisfied a long and widely-felt need, and Rite-Hite succeeded where others, including Kelley prior to copying, had failed. *Atlas Powder Co. v. E.I. DuPont de Nemours & Co.*, 750 F.2d 1569, 1574–76, 224 U.S.P.Q. 409 (Fed.Cir.1984); *Lang v. Prescon Corp.*, 545 F.Supp. 933, 945–46, 217 U.S.P.Q. 839 (D.Del.1982); *Tracor, Inc. v. Hewlett-Packard Co.*, 519 F.2d 1288, 1306, 186 U.S.P.Q. 468 (7th Cir.1975). At the time Rite-Hite's claimed invention was made, no known device accomplished the

same results in a similar manner. Rite-Hite's invention, in fact, satisfied this particular need in a unique manner. That is invention. *Jones*, 727 F.2d at 1531.

99. One of the advantages of Rite-Hite's invention is that it uses a simple means to maintain the restraint in the elevated, operative position. The '847 patent discloses a ratchet and pawl as one means to retain the hook in its upper position. But none of the asserted claims recite a ratchet and pawl or even just hook retaining means. Rather, a combination of elements coacting in a novel and unobvious manner are recited. The advantage of the combination went unrecognized for years by the industry, though ratchets and pawls, as well as racks and pinion gears, were well known. This supports the unobviousness of the patent in suit. *Jones*, 727 F.2d at 1530. If anything, Kelley's reliance on earlier devices in the vehicle industry, such as an automobile jack, as well as its own patent for its Panic Stop using ratchet and pawl combinations, shows that no one before Rite-Hite, even with the art before him, ever thought of the combination of the '847 patent.

100. The imitation of the patented invention by an alleged infringer is strong evidence of what it thinks of the patent in suit and is persuasive of what the rest of the world ought to think. *Anderson Co. v. Sears, Roebuck & Co.*, 165 F.Supp. 611, 623, 119 U.S.P.Q. 236, 244 (N.D.Ill.1958), *modified on other grounds* 265 F.2d 755, 121 U.S.P.Q. 161 (7th Cir.1959). Here, Kelley's failure to develop a vehicle restraint prior to having access to Rite-Hite's vehicle restraint and Kelley's adoption of the vertically moving hook and other elements claimed in the '847 patent provide additional evidence of unobviousness. *Lang*, 545 F.Supp. at 945–46. In fact, Kelley's vehicle restraint, which was identified by Kelley's personnel as "Kelley's version of the Dok-Lok" (PTX–36), was nonexistent until Kelley obtained literature relating to Rite-Hite's vehicle restraint and actually inspected, disassembled, and photographed the Rite-Hite product. *General Monitors,*

*Inc. v. Mine Safety Appliances Co.*, 211 U.S.P.Q. 1126, 1140 (C.D.Cal.1981). Indeed, the imitation and copying by Kelley was strong evidence that Kelley believed that invention lay in the Rite-Hite product. *Ackermans v. General Motors Corp.*, 202 F.2d 642, 645, 96 U.S.P.Q. 281 (4th Cir. 1953), *cert. denied*, 345 U.S. 996, 73 S.Ct. 1139, 97 L.Ed. 1403 (1953).

101. A further indicium of nonobviousness was the evidence that Rite-Hite's invention has also had considerable commercial success. Rite-Hite has sold well over 1,800 MDL–55 restraints falling within the asserted claims of the '847 patent (PTX 81). There is no question that a substantial cause of this commercial success is the claimed configuration. *Fromson*, 755 F.2d at 1556–58; *Magnavox Company v. Chicago Dynamic Industries*, 201 U.S.P.Q. 25, 27 (N.D.Ill.1977).

## N. *The Prior Art Does Not Show the Claimed Invention*

102. To assert that a patent claim is anticipated under 35 U.S.C. § 102, a party must demonstrate identity of invention. *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 771 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984). The determination that a claimed invention is "anticipated" under § 102 is a factual determination. *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1458 (Fed.Cir.1984).

103. One who seeks such a finding of anticipation must show that each and every element of the patent claim is found, as arranged in the claim, either expressly described or implicitly described under appropriate principles of inherency, in a *single* prior art reference, or that the claimed invention was previously known or embodied in a single prior art reference, or that the claimed invention was previously known or embodied in a single prior art device or practice. *Lindemann Maschinenfabrik GMBH*, 730 F.2d at 1458. "Unless all of the same elements are found in exactly the same situation and united in the

same way to perform an identical function, there is no anticipation." *National Business Systems, Inc. v. AM International, Inc.*, 546 F.Supp. 340, 350 (N.D.Ill.1982), *aff'd*, 743 F.2d 1227 (7th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 2345, 85 L.Ed.2d 861 (1985).

### O. *Kelley's Infringement of the '847 Patent*

■ 104. The United States patent laws state that whoever without authority makes, uses, or sells any patented invention within the United States during the term of the patent infringes the patent. 35 U.S.C. § 271(a). The patent owner has the burden of proving infringement by a preponderance of the evidence. This burden extends to infringement under the doctrine of equivalents as well as to literal infringement. *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361, 219 U.S.P.Q. 473 (Fed.Cir.1983).

■ 105. The issue of infringement raises at least two questions: (1) what is patented,[2] and (2) has what is patented been made, used, or sold by another. The first is a question of law; the second is a question of fact. *SSIH Equipment S.A. v. U.S. International Trade Commission*, 718 F.2d 365, 376, 218 U.S.P.Q. 678, 688 (Fed.Cir.1983); *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569, 219 U.S. P.Q. 1137, 1140 (Fed.Cir.1983). In this case, Rite-Hite obtained a patent claiming a vehicle restraint having a combination of elements performing recited functions. The Truk Stop device, made and sold by Kelley, infringes the asserted claims.

#### a. *Literal Infringement*

■ 106. If an allegedly infringing product falls literally within the claim when the words are given their proper meaning, infringement is made out, and that is the end of the inquiry. *Graver Tank and Mfg. Co. v. Linde Air Products Co.*, 339 U.S.

605, 607, 70 S.Ct. 854, 855–56, 94 L.Ed. 1097, 85 U.S.P.Q. 328 (1950).

■ 107. The question of infringement is resolved by comparing the accused device with the claims of the patent, not with the structure described in the patent or the patentee's commercial device. *Martin v. Barber*, 755 F.2d 1564, 1567, 225 U.S.P.Q. 233, 235 (Fed.Cir.1985). The claims of a patent are to be construed in light of the specification, and both are to be read with a view to ascertaining the invention. *United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572, 148 U.S.P.Q. 479, 482 (1966). Each claim must be considered as defining a separate invention. *Jones*, 727 F.2d at 1528. In construing or interpreting a claim, a whole host of facts (e.g., patent disclosure, the prosecution history in the Patent and Trademark Office, the prior art and comparison with other claims) may be considered. *Graham*, 383 U.S. at 32–33, 86 S.Ct. at 701; *Fromson*, 720 F.2d at 1569–71.

#### (1) *"Means Plus Function" Claims*

■ 108. The independent claims in the '847 patent utilize "means plus function" language. Title 35 U.S.C. § 112 is used to interpret these functional claims and states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material or acts described in the specification and *equivalents thereof.* [Emphasis added.]

To interpret the statute as limited to a particular means set forth in the specification would be to nullify that provision of § 112. The patentee's claim covers all combinations which utilize as the stated means the structure described in the specification for performing the stated function and also all combinations that utilize any

---

**2.** In a patent infringement action, patent claims measure the invention and define the boundaries of patent protection. *Reese v. Elkhart*

*Welding & Boiler Works Inc.*, 447 F.2d 517, 171 U.S.P.Q. 129 (7th Cir.1971).

structure which is the equivalent of that described structure insofar as it performs the stated function. *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed.Cir.1985). The Court in *Palumbo v. Don-Joy Co.*, 762 F.2d 969, 975 (Fed.Cir. May 20, 1985), recognized that a "means plus function" claim is construed "to cover *both* the disclosed structure *and* equivalents thereof" for performing the stated function. The Court in *Palumbo* added that an important factor in the determination of equivalents is whether persons reasonably skilled in the art would know of the interchangeability of an ingredient not contained in the patent with one that was. *Palumbo*, at 977.

■■■ 109. In construing such a claim, a number of factors may be considered: (1) the language of the claim, (2) the patent specification, (3) the prosecution history of the patent, (4) other claims in the patent, and (5) expert testimony. Once these factors are weighed, the scope of the "means" claim may be determined, and whether the Kelley device is a § 112 equivalent of the described embodiment is a question of fact. *Palumbo*, at 975–76. Here, looking to the prosecution history of the '847 patent, the amendments to the claims and description following the citation of the Taylor, et al., patent makes it clear that the scope of equivalents for the third means is broad.

■■■ 110. In addition, Kelley cannot escape infringement by the mere fact that its Truk Stop restraint is more or less efficient than the subject matter Rite-Hite claimed, or performs additional functions or adds features or is an improvement. *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1481–82, 221 U.S.P.Q. 649, 653 (Fed.Cir. 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 306, 83 L.Ed.2d 240, 224 U.S.P.Q. 616 (1984); *Radio Steel & Manufacturing Co. v. MTD Products, Inc.*, 731 F.2d 840, 848, 221 U.S.P.Q. 657 (Fed.Cir. 306, 224 U.S. P.Q. 616 (1984); *Radio Steel & Manufacturing Co. v. MTD Products, Inc.*, 731 F.2d 840, 848, 221 U.S.P.Q. 657 (Fed.Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 119, 83 L.Ed.2d 62 (1984); *Atlas Powder Co.*,

750 F.2d at 1579–81. Nothing in the claims of Rite-Hite's patent limit the invention to a manual device or one with communications apparatus.

■■■ 111. Furthermore, the broader claims asserted here cannot be construed to be limited to a ratchet and pawl as the "third means," or to manual operation. This law is applicable here because Claims 5, 6, and 7 of the '847 patent, which are not asserted, recite that the third means includes a ratchet and pawl, and Claims 4 and 9 recite manual operation. These narrow claim limitations cannot be read into the broader claims to avoid infringement. *D.M.I.*, 755 F.2d at 1574.

### b. *Doctrine of Equivalents*

■■■ 112. Kelley cannot avoid a finding of infringement by arguing that its device falls outside a literal reading of the claims of the '847 patent. Although the claims of a patent are the measure of the protected invention, the judicially created "doctrine of equivalents" adds latitude and breadth to the application of claim language in order to prevent the infringer from perpetrating "a fraud on a patent." *Graver Tank and Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 85 U.S.P.Q. 328 (1950). The doctrine of equivalents is designed to protect a patentee, such as Rite-Hite, from an infringer, such as Kelley, who appropriates the invention even if the infringer avoids the literal language of the claims. As such, a finding of infringement is in order here because Kelley's device performs the same function in substantially the same way to achieve substantially the same result as the claimed invention. *Atlas Powder Co.*, 750 F.2d at 1579–81; *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929); *Graver Tank*, 339 U.S. at 607, 70 S.Ct. at 855–56. Under this doctrine, Rite-Hite's claims are infringed by Kelley's imitation even if Kelley did not precisely clone every literal detail of Rite-Hite's claimed invention.

■ 113. The range of equivalents to which a patent claim is entitled is on a sliding scale depending on the nature of the invention. *John Zink Co. v. National Airoil Burner Co.,* 613 F.2d 547, 555, 205 U.S.P.Q. 494 (5th Cir.1980); *Julien v. Gomez & Andre Tractor Repairs, Inc.,* 438 F.Supp. 763, 766, 196 U.S.P.Q. 224 (M.D.La. 1977), aff'd, 607 F.2d 1004 (5th Cir.1979). In particular, when a patented invention has had "significant commercial success" ' or the patent is of the "pioneer type," the patent claims are to be construed liberally and are not to be limited to the identical means and mode of operation shown in the patent. *Graver Tank,* 339 U.S. at 608–09, 70 S.Ct. at 856; *King-Seeley Thermos Co. v. Reynolds Products, Inc.,* 322 F.Supp. 713, 720 (N.D.Ill.1970); *Chicago Patent Corp. v. Genco, Inc.,* 124 F.2d 725, 728 (7th Cir.1941). The broadest protection is given to "a patent covering a function never before performed, a wholly novel device, or one of such novelty and importance as to mark a distinct step in the progress of the art." *Ziegler v. Phillips Petroleum Co.,* 483 F.2d 858, 870, 177 U.S.P.Q. 481 (5th Cir.1973), *cert. denied,* 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485, 180 U.S.P.Q. 1 (1973). The Rite-Hite patent is a pioneer patent because it claims a vehicle restraint that functions in a novel manner, unlike any of the earlier restraints of Rite-Hite or anyone else.

■ 114. Broad protection is given not only to so-called pioneer patents, but also patents that make a substantial contribution to an existing art and patents that consist of a combination of old ingredients that produce new and useful results. *Graver Tank,* 339 U.S. at 608, 70 S.Ct. at 856; *Julien,* 438 F.Supp. at 766. Accordingly, the claims of a patent are entitled to a range of equivalents commensurate with the scope of the invention. *Ziegler,* 483 F.2d at 869. In this instance, because of the significant advance in the art presented by the Rite-Hite '847 patent and the manifest commercial success, the claims are given the broadest possible interpretation.

■ 115. In addition, the mere use by Kelley of a component that may be more sophisticated than that disclosed in the specific embodiment of the Rite-Hite patent does *not* allow Kelley to escape an appropriate range of equivalents and thereby avoid infringement of the claimed invention. *Hughes Aircraft Co.,* 717 F.2d at 1365–66; *Atlas Powder Co.,* 750 F.2d at 1579–81; *Bendix Corp. v. United States,* 600 F.2d 1364, 1382, 220 Ct.Cl. 507, 204 U.S.P.Q. 617, 631 (1979).

**P. *Rite-Hite's Right to Recover Prejudgment Interest***

■ 116. In addition to the other relief recoverable for infringement of its patent, the patentee should recover prejudgment interest as provided in 35 U.S.C. § 284 in order to prevent the infringer from having the benefit of the use of the money which it would have been paying in royalties. *General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983).

■ 117. The asserted claims of the '847 patent are not invalid and are infringed by Kelley by making and selling the Truk Stop vehicle restraint.

**Q. *Multiplied Damages and Attorneys' Fees Are Not Warranted***

118. Under 35 U.S.C. § 284, multiplied damages up to three times the amount found or assessed may be awarded by the Court. Kelley's activities here do not warrant such an award.

119. The activities of Kelley and the circumstances of this case are not sufficiently exceptional to prompt an award of attorneys' fees under 35 U.S.C. § 285.

**III. STAY OF EXECUTION**

■ 120. Kelley has moved for a stay of injunction pending appeal. The motion is technically premature because a notice of appeal has not yet been filed, but the Court has the authority to grant a stay conditioned on the movant's filing of a notice of appeal within a specified period.

121. Under Fed.R.Civ.P. 62(c), the Court may in its discretion suspend a final judgment granting an injunction if the party seeking suspension of the judgment pending appeal can show: (1) that it is likely to prevail on the merits on appeal; (2) that unless a stay is granted it will suffer irreparable injury; (3) that a stay would not substantially harm other parties to the litigation; and (4) that a stay is in the public interest. *Adams v. Walker,* 488 F.2d 1064, 1065 (7th Cir.1973); *Decker v. U.S. Department of Labor,* 485 F.Supp. 837, 844 (E.D.Wis.1980). A showing of absolute probability of success on the merits on appeal need not be made if the injunction would destroy the status quo, irreparably harming the appellant, and granting of the stay will cause only slight harm to the appellee. *Providence Journal Co. v. Federal Bureau of Investigation,* 595 F.2d 889 (1st Cir.1979).

122. Upon consideration of the foregoing factors and the affidavit of Kelley which has been submitted *in camera,* I conclude that a stay of the injunction without bond should be allowed pending Kelley's appeal.

### ORDER

IT IS THEREFORE ORDERED that the defendant Kelley Company, Inc., its officers, employees, agents, and those in privity with them are enjoined from infringing U.S. Patent 4,373,847 by the manufacture or sale of vehicle restraints sold under the trademark Truk Stop and embodying the claimed vehicle restraint pursuant to 35 U.S.C. § 283, and that Kelley is liable to the plaintiffs for damages, including prejudgment interest, as a result of its infringement.

IT IS FURTHER ORDERED that Kelley's motion for a stay of the above-described injunction pending appeal is granted pursuant to Fed.R.Civ.P. 62(c), but further, this stay shall expire within thirty days of the filing date of this decision and order unless a notice of appeal is filed within that period.